### In re DAVIS' ESTATE.
### DAVIS et al. v. DAVIS.

No. 25194.   March 12, 1935.

Rehearing Denied April 16, 1935.

Cook & Bingaman and Vance & Bliss, for plaintiffs in error.

Carey Caldwell and S. F. Parks, for defendant in error.

PHELPS, J.   Thompson Davis was a 72-year-old full-blood restricted Indian. He was a bachelor and had no living parents, brothers, sisters, or children. In April, 1929, he married, and a few days later he executed a will leaving all of his estate, consisting chiefly of about $50,000 in cash and bonds held for him by the Indian Agency, to his wife, Effie Davis, the defendant in error. He died January 16, 1933, and thereafter the widow filed her petition for the probate of the will in the county court of Craig county, whereupon the plaintiffs in error, certain collateral kindred of the deceased, contested the will and probate thereof. Both the county court and, upon appeal, the district court admitted the will to probate, and this appeal is by the contestants, who will hereinafter be referred to by that name.

The questions to be determined are three: First, does the county court of

Craig county have jurisdiction of this estate? Second, did the testator possess testamentary capacity? Third, did the testator execute the will in compliance with the requirements of law?

We have often announced the rule that in an appeal of this nature we will examine the whole record for the purpose of determining whether the findings and judgment of the trial court are supported by the evidence and will refuse to reverse the judgment unless the conclusion reached by the trial court is clearly against the weight of the evidence. In re Estate of James, 131 Okla. 142, 268 P. 296, and cases there cited. In compliance with that duty and due to the great difference of opinion expressed by the parties in their briefs as to the testimony of witnesses in the case, we have read the record and find the facts governing the determination of the three above questions to be substantially as appear below.

First, as to the jurisdiction: If Thompson Davis had a fixed place of abode prior to 1923, it was probably Tahlequah. That year, however, he bought the home place of his nephew at Vinita, Craig county, and the nephew and his wife moved away. To this place Davis moved all of his personal belongings, including household goods and a wagon and team, living there as a bachelor until 1929, when he married the proponent, the widow of his nephew, who had died in the meantime. When decedent first moved into the house he had a niece keep house for him, but they got along badly together and she moved away, whereupon proponent and her husband, the nephew, returned and kept house for him. When proponent and decedent married they continued to live in the house, if his being away from home virtually all of the time does not prevent our calling the place his home within the meaning of the law.

Thompson Davis was of an ambulatory nature; he roved around from place to place, would stay awhile in one place and then move to another. He said he liked to travel. When he married, this habit was not materially changed, and from that time until his death four years later, he spent most of his time in Tahlequah, but also made frequent visits and spent considerable time in Muskogee, Stilwell, Hulbert, and *other places. Numerous witnesses testified* that he referred to Vinita as his home, but complained that the water in that town did not agree with him. There seems to

have been a total absence of domestic trouble, and frequently when in Muskogee or other places he would telephone his wife and she would go to him on the first train and visit there for a day or so, subsequently returning to the home place in Vinita. A Tahlequah taxi driver, who had driven decedent to Muskogee and to and from the train at Tahlequah during the 18 months before decedent died, testified that decedent said "sometimes he stayed here and sometimes at Hulbert, but his right home was in Vinita." Without, of course, having heard the witnesses, but basing our conclusions on the record, we would say that if the man had a home at all, any fixed place of abode, it must have been at Vinita, regardless of his wanderings.

The decedent being a resident of this state at the time of his death, section 1069, O. S. 1931, requires that his will must be proved and letters testamentary granted "in the county of which the decedent was a resident at the time of his death, in whatever place he may have died." The word "residence," used in this connection, means the same as "legal residence" or "domicile." Richards v. Huff, 146 Okla. 108, 293 P. 1028. The question of residence is one of jurisdiction, and unless the decedent's residence was in Craig county the county court did not have jurisdiction to probate this will. In re Elrod's Estate, 154 Okla. 84, 6 P. (2d) 676; Cartwright v. Holcomb, 21 Okla. 548, 97 P. 385. James v. Sanders, 95 Okla. 195, 218 P. 877.

The residence of a man having a family which he maintains is prima facie where the family dwells; it connotes a settled or fixed abode of a character indicating permanency, at least for an indefinite time. It signifies a party's permanent home and principal establishment, which, whenever he is absent, he has the intention of returning. Jones v. Reser et al., 61 Okla. 46, 160 P. 58; Richards v. Huff, supra. There can be no doubt that when the term is used with reference to the venue of probate proceedings the foregoing definition is the most satisfactory test of "residence" or "resident," as used in such a statute. There is a distinction between such use of the term and the manner in which it is sometimes used for other purposes; for instance, in attachment one may have a fixed place of abode to which he intends returning, and yet may absent himself under such circumstances and for so long a period as would make it proper to obtain jurisdiction

against him by attachment proceedings against local property, under the allegation and on the ground that he was a "nonresident." For the purpose of an attachment proceeding he could in some cases be a nonresident, yet in probate proceedings be a resident. 2 R. C. L. 819; Waples on Attachment (2d Ed.) sec. 45.

Davis was either a resident of Tahlequah, in Cherokee county, or Vinita, in Craig county. As to venue in probate proceedings, he could have but one residence at a time. Richardson v. Gregg, 144 Okla. 102, 290 P. 190; James v. Sanders, 95 Okla. 195, 218 P. 877. When in 1923 he moved, with all of his belongings, to the home he bought in Vinita and set up housekeeping there, it was an establishment of a residence in that county. For us to say that at the time of his death he had established a new residence in Tahlequah, it would be necessary for us first to determine that he had abandoned the residence in Vinita with the intention not to return. Youngblood v. Rector, 126 Okla. 210, 259 P. 579. But the evidence does not support any such conclusion. To the contrary, all the evidence reflects the intention of the decedent to return to Vinita, which he called his home. Even in his last illness, while away from home, he expressed the desire to be taken home, meaning Vinita. It was the place where he had lived six years prior to his marriage, which he had never abandoned. and where the family of which he was the head was still residing. The conclusion of both the trial courts that Craig was the county of decedent's residence, although disputed by contestants' witnesses, is not against the clear weight of the evidence as reflected by the whole record.

The second question involved is that of testamentary capacity. The contestants offered the testimony of several witnesses who had known decedent for long periods of time. Some of them testified as to facts which would indicate an intelligence below normal and an attesting witness gave his "opinion," unsupported by facts, that testator was not competent to make a will. However, the witnesses testifying for proponent commended the intelligence of the decedent and their description of his ability to property safeguard his interests in ordinary business transactions appeared quite convincing. No evidence was offered that at the time of the execution of the will he was either above or below his customary mental level and capacities. It was

for the trial court to determine the credibility of the various witnesses, and we cannot say that the evidence fails to support the finding that at the time of the execution of this simple will the testator was possessed of that degree of intelligence and understanding necessary to the proper execution thereof.

The third question to be considered is whether there was a substantial compliance with the requirements of our statutes governing the execution of wills. The evidence disclosed that decedent entered the office of the attorney who drew the will, and told him that he wanted to make his will and leave all of his estate to his wife; that the attorney had not theretofore represented or advised testator in any matter; that the formal requirements for the execution of a will were explained by the attorney and that the testator apparently understood them; the attorney took notes, prepared the will, and after a few days testator returned to the office and the attorney asked him what persons he wanted for witnesses. The testator named the two attesting witnesses who worked in a bank across the street, where the attorney and testator then went.

The attorney and both attesting witnesses (one by deposition) testified as to what occurred at the bank The contestants questioned the execution because of their claim that the testator did not declare to the attesting witnesses that the instrument was his will, that he did not request them to sign the will as witnesses, and that the evidence does not disclose that he knew it to be his will. On inspection of the record we find that the excerpts therefrom quoted by plaintiffs in error are not by any means all of the pertinent testimony on the subject. In addition to the abstract of evidence with which counsel for plaintiffs in error have favored us, we find that contestants' own witness, Duncan, testified by deposition that the testator requested the two attesting witnesses to sign the instrument, but that the request was accomplished in this manner: One of the attesting witnesses asked testator, "Do you want us to witness your will?" to which the testator replied "Yes," and that testator understood the question; also that the attorney said to the testator, "You have signed your will—you have made your will," and the testator said "Yes"; further, this same witness was asked the following questions and answered as indicated: "Q. Did he,

at any time, declare that to be his last will and testament? A. Yes. * * * Thompson didn't come out and say, 'This is my last will and testament'." This witness further gave it as his opinion that testator understood the question and that, in his opinion, the testator knew that it was his will he was signing. There is also direct testimony that the testator declared that he knew he was signing his will. Further, the attorney who drew the will and supervised its execution, having first testified that he had had a prior experience involving the contest of the execution of a will which he had drawn and for that reason took extra pains to see that this execution was properly accomplished, testified that the testator declared to the attesting witnesses it was his will, and "we would have been there yet if he hadn't told them that." This witness further testified that the wife of testator was present and that in answer to a question asked him, testator turned to his wife and said, "You tell them," but that before the proceedings were terminated "he did the telling" (meaning testator), that testator told them it was his will and used the word **"will,"** and that witness had told testator beforehand that he would have to tell the attesting witnesses that it was his will and had explained all of the formalities to the testator, who understood them. On cross-examination, when this witness was asked whether the attesting witnesses were wrong when they failed to testify that testator used the word "will" he replied as follows: "If they say he did not, they are wrong about it, because I know he did. I was there to see that he executed properly. I stood guard to see it was done. That was what he hired me for to write his will and see that it was properly executed."

Unless we must hold that the testimony of the attorney was false, purely by reason of the fact that he was also an attorney in the case, we cannot approve the implied request contained in the brief of contestants that we disregard his testimony.

But, entirely aside from that matter, the testimony of the attesting witnesses alone was sufficient for the findings of the trial courts that the will was properly executed. Although the third paragraph of section 1546, O. S. 1931, requires that "the testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will," and although the fourth paragraph of said section requires that the attesting

witnesses sign at the end of the will "at the testator's request," we have held that it is not necessary for the testator to actually use the word "will," and it is not necessary that he actually make the request in words, and that a substantial compliance with said section is all that is necessary. Any exclamations, declarations, or gestures made in response to inquiry as to his intention or desire, which clearly convey his thoughts and intentions and about which reasonable minds would not differ, are a sufficient method or manner of expressing his intentions and desires. Speaks v. Speaks, 98 Okla. 57, 224 P. 533. Mere failure to use the exact language specified in the statute is not sufficient to justify the setting aside of a will. The testimony in the case developed that the testator was at least asked whether this was his will and whether he knew what the instrument was, and he said "Yes," all of which is sufficient on that particular phase, regardless of whether he personally used the word.

The contestants further complain that the testator did not understand the English language; they name several witnesses as having so testified. The record as a whole does not support such claim. On the contrary, an examination of the entire record has disclosed that the testator knew and used sufficient English to transact his ordinary business affairs, to understand the nature of the transaction here involved, and to convey his meaning to others in that language. The cases of Hill v. Davis, 64 Okla. 253, 167 P. 465; McCarty v. Weatherly, 85 Okla. 123, 204 P. 632; In re Stover's Will, 104 Okla. 251, 231 P. 212, and the excerpts from R. C. L. are not in conflict with any principles herein announced. We find in those cases no requirement that the testator must in express words declare that the instrument is his will and in the same manner make the request of the witnesses to sign it. In fact, in Hill v. Davis, supra, we stated that the witnesses must be so "informed in some way," and that there must be **"substantial compliance."**

An examination of the record impels us to conclude that the findings of the trial court on the foregoing three questions were not "clearly against the weight of the evidence," but on the contrary were amply supported by the evidence. The judgment of the district court is affirmed.

McNEILL, C. J., and RILEY, BAYLESS, BUSBY, CORN, and GIBSON, JJ., concur.

OSBORN, V. C. J., dissents. WELCH, J., absent.