1999 OK CIV APP 4

### In the Matter of the ESTATE OF Robert F. MOWDY, Deceased,

### Michele L. Mowdy Cook, Roberta Lesli Mowdy Whiting, and Joel Carlton Mowdy, Plaintiffs/Appellants,

v.

### Sharon I. Mowdy, Defendant/Appellee.

### No. 90,641.

Court of Civil Appeals of Oklahoma, Division No. 1.

Aug. 28, 1998.

Rehearing Denied Oct. 9, 1998.

Certiorari Denied Jan. 14, 1999.

---

Austin R. Deaton, Jr., Ada, Oklahoma, For Appellants,

Denzil F. Lowry, Jr., Ada, Oklahoma, For Appellee.

### OPINION

GARRETT, Judge:

¶1 Appellants, the children of Robert F. Mowdy, Deceased, appeal the trial court's order admitting Mowdy's will to probate. Appellee, step-mother of Appellants, is Mowdy's surviving spouse. Appellants contested the will on grounds of improper execution and attestation and undue influence by a person in a confidential relationship with their father. They alleged Appellee wrote the will and pressured Mowdy to execute it. They contended the will was contrary to Mowdy's previously expressed testamentary intentions, as well as to the antenuptial agreement he and Appellee signed prior to the marriage. The trial court ruled there was substantial compliance with the statutory requirements for execution of a will and that Appellants had failed, by clear and convincing evidence, to prove undue influence. The court admitted the will to probate, and this appeal followed.

¶2 For reversal, Appellants contend:

1. The trial court erred in failing to sustain Appellants' demurrer to Appellee's evidence.

2. The trial court erred in admitting the will despite the unrebutted presumption of undue influence.

3. Findings of the trial court regarding Decedent's personality and personal characteristics are not sufficient to relieve Appellee of the requirement to show Decedent received independent, competent and disinterested advice.

4. The trial court erred in finding Appellee "the natural object of his bounty", contrary to the antenuptial agreement dated February 10, 1978. The trial court's finding is against the clear weight of the evidence.

5. The trial court erred in finding that Decedent's will had been properly and legally subscribed, published and acknowledged.

¶3 Appellants contend the evidence proved that Appellee wrote Decedent's will, that she was with him when he executed it and that she destroyed his previous wills. They also contend the evidence showed Appellee was in a confidential relationship with Decedent, being his wife and former secretary, which raises a presumption of undue influence, requiring independent legal advice. They contend the burden of proof then shifted to Appellee. Because Appellee offered no evidence that Decedent received independent and disinterested advice before executing his will, they contend she failed to rebut the presumption.

¶4 It is well known that spouses exert influence over one another during a marriage and that a spouse is generally the natural object of a testator's bounty. In *Canfield v. Canfield*, 1934 OK ——, 167 Okla. 590, 31 P.2d 152, 156, a case in which a decedent's third wife received his entire estate, undue influence was alleged by his children from his first two marriages. The Court quoted approvingly from *Underhill on Wills*, p. 211:

If a wife by her industry and virtue, and by the assistance which she has rendered her husband, has gained such an ascendancy over the mind of her husband; if she has by her faithfulness and good qualities secured his respect and esteem, so that her wish is a law to him, such influence, though it result in procuring a will in her favor to the total exclusion of all the relatives of the

husband, would not amount to undue influence.

¶5 In *Matter of Estate of Maheras*, 1995 OK 40, 897 P.2d 268, the Court restated Oklahoma law on the effect of undue influence on the procurement of a will:

If a will is found to have been affected by undue influence, the district court may declare it void in whole or in part. The burden of persuasion in a will contest based on undue influence rests on the contestant. A two-prong test is used to determine whether undue influence taints the procurement or preparation of a will. First, the court must search for the presence of a relationship which would induce a reasonably prudent person to repose confidence and trust in another—i.e., *a confidential relationship*. Second, the court must decide that *the stronger party in the relationship assisted in the preparation or procurement of the weaker person's testamentary instrument.* Factors to be considered in applying this two-prong test include:

1. Whether the person charged with undue influence was *not-* a natural object of the maker's bounty;

2. Whether the stronger person was a trusted or confidential advisor or agent of the will's maker;

3. Whether he/she was present and/or active in the procurement or preparation of the will;

4. Whether the will's maker was of advanced age or impaired faculties;

5. Whether independent and disinterested advice regarding the testamentary disposition was given to its maker. [Emphasis in original.] [Footnotes omitted.]

¶6 Establishing that a "confidential relationship" exists is required in establishing undue influence was exercised. In *Matter of Estate of Beal*, 1989 OK 23, ¶15, 769 P.2d 150, 154–155, the Court quoted with approval the explanation of "confidential relation" from *In re Null's Estate*, 302 Pa. 64, 153 A. 137 (1930), as follows:

" 'Confidential relation' is not confined to any specific association of parties. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. Where one is bound to act for the benefit of another, he can take no advantage to himself. No precise language can define the limits of the relation; it generally exists between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent. In such cases, the "confidential relation" is a conclusion of law; *in others, as parent and child, it is a question of fact to be established by the evidence."* [Emphasis supplied.]

¶7 The *Beal* Court then stated, at 1989 OK 23, ¶18, 769 P.2d 150, 154–155, what was required to prove undue influence within a confidential relationship:

The presumption referred to does not ordinarily arise (or fail to arise) in a vacuum of other facts. A confidential relationship for undue influence purposes is not going to arise (absent a strict classical fiduciary relationship) merely by reason of the nominal relationship (nephew to uncle, secretary to employer, banker to customer, etc.) The courts before declaring the relationship confidential will require a relation where there is weakness on one side and strength on the other resulting in dependence or trust justifiably reposed in the stronger. Thus the condition of the testator is always of critical importance....

■ ¶8 Appellants contend the trial court's finding that Decedent "was the *stronger* party in the marital relationship" showed an inaccurate application of the meaning of "stronger" and "weaker" for purposes of a confidential relationship and undue influence. Rather than stronger characteristic or personality type, Appellants contend the nature of the relationship defines the relative positions of "stronger" or "weaker", such as attorney/client, trustee/settlor or advisor/advisee. However, this argument, and the authorities cited to support it, ignores the language of *Matter of Estate of Beal*, supra, that a "confidential relationship" within a fiduciary relationship is determined as a matter of law, but that in others, such as par-

ent/child, it is a question of fact to be determined by the evidence. This case comes within the latter category and must be determined by the evidence.

¶ 9 The attesting witnesses testified at the trial. Carolyn Sue Cicio testified she had known Decedent several years and described him as very outgoing, friendly, very knowledgeable and well educated. She stated that on the day he executed his will, he was in a good mood and was "kidding and going on with me, like he always did." She did not recall anything from that day to make her think he was doing something which made him uncomfortable or that he did not want to do. She does not remember Appellee saying anything or taking an active part in the execution of Decedent's will. When asked if she had had any doubt that he intended the document to be his will, she stated, "Well, I believe that that's what he wanted. Bob, to me, was not a man that, you know, he was a man of his own means. If he hadn't wanted that, he wouldn't have asked me to sign it, is what I believe."

¶ 10 Jim W. Epperson testified that he had known Decedent all of his life and had had a business relationship with him. He described him as highly organized and completely in charge at all times with any kind of business he was conducting. He found Decedent was not easily persuaded or influenced by others in his business and personal decisions and was "almost to the point of being a dominator." Brian Martin VanHorn testified he and Decedent looked at oil and gas deals together, and they participated together in commodity trade ventures. He and his wife also saw Decedent and Appellee socially. He described his character and personality as honest, straightforward, very independent minded, and trusting. He described his ability in business dealings with others as "very straightforward and was well prepared and knew how to close a deal, or cut a deal, if he wanted to." He also said Decedent was not easily persuaded by others in reaching a decision about business matters. He described him as "very bullheaded", and said when he made up his mind, it was hard to change it. He testified he spoke to Decedent two days before his death, and that Decedent

maintained all of these characteristics, character and personality right up to the time of his death. He got no indication of mental or physical infirmity shortly before his death and stated that he and his wife were amazed how much energy Decedent had and "how sharp he was at his age." From his personal observations, Decedent spoke highly of his wife and children and was never aware of any serious problems in their marriage. He stated Decedent never confided in him about a threatened divorce or separation.

¶ 11 Appellee testified she typed her husband's will according to his instructions on her home computer. She also typed her own will on the home computer and had it executed at the same time he had his will executed. She testified she continued doing secretarial tasks for Decedent during their marriage, after having been his legal secretary prior to the marriage.

¶ 12 We hold the evidence clearly supports the trial court's finding that Appellee did not exercise undue influence on Decedent. The trial court found he was the decision maker in the marriage as to financial decisions and running the household. The trial court also found no evidence that Decedent's age, health or stress impaired his faculties and that he remained focused until his death. The court also found a confidential relationship existed between Decedent and Appellee and that Appellee was the natural object of his bounty. The weight of the evidence clearly supports these findings. Although Decedent's children, Appellants herein, argue he was under great stress and infirm health, we find no evidence that the decisions he made with regard to his will were made under duress or because Appellee exerted undue influence over him. His affection for Appellee is shown by the evidence. Influence which arises from natural affection is insufficient to invalidate a will; it is only when the influence is wrongful and confuses the judgment and control of the testator that a court will find the will invalid. See *Matter of Estate of Yoss*, 1997 OK CIV APP 65, 947 P.2d 607 (Cert. Denied 1997). "Influence secured through acts of kindness is not wrongful, and therefore not undue." *Matter of Estate of Webb*, 1993 OK 75, ¶ 27, 863 P.2d

1116, 1121, citing *Canfield v. Canfield, supra,* 31 P.2d at 156.

¶ 13 Appellants also contend the trial court erred in finding Decedent's will was properly subscribed, published and acknowledged, pursuant to 84 O.S. Supp.1996 § 55(1–4).[1] They contend the evidence shows Decedent did not sign the will in the presence of the witnesses, that he did not acknowledge to the witnesses that it was his signature, or declare to the witnesses that the instrument was his will. Appellants acknowledge that only substantial compliance with the statute is required. However, they contend such compliance requires that a testator expressly declare the instrument is his will and request the witnesses either to witness his signature or attest his execution by signing the will.

¶ 14 William Edward Denny testified Decedent came into C & C Hardware and asked him to "do me a favor, I want you to sign my will." He remembered joking by saying, "I sure will, Bob, if you'll include me in it." They walked over to Valley Abstract where the will was spread out over a desk. Decedent accompanied him to the desk and showed him where to sign. He said Decedent had already signed the will. He also stated he was familiar with his signature because he had "seen it quite a bit over there at the store, so that's pretty well like it." Although on cross examination Mr. Denny said Decedent did not tell him it was his will at the time he was signing it, he stated, "He declared that's why he come in the store to get me for."

¶ 15 Another witness, Evelyn Pyeatt, testified Decedent came in to her office at Valley Abstract. She overheard him say to Vivian Pasquali he wanted her to witness his will. Vivian told him she was too old to witness it, but she would take his acknowledgment and that he should get other witnesses. She suggested Evelyn. He handed her the will, and he went to the hardware store to get more witnesses. She remembered hearing him say "witness my will" to Vivian. Evelyn also testified she saw Decedent sign his will, and she recalled seeing her sister sign the will as notary.

¶ 16 Sue Cicio testified she remembered Decedent asking her personally to sign the instrument. Although he did not tell her it was his will, she stated he came into the store where she worked and she had just come back from lunch. She said he was always kidding around and said something to the effect of "watch me sign my life away, or my belongings, or something to that effect." She said she was familiar with his signature because she had waited on him quite a lot and had seen his signature "day in and day out, because he was over there nearly every day of the week, especially when he was working on his building that burned." Although she did not see Decedent sign the will, she testified she was sure he would have expected her to recognize his signature because of his prior dealings at the store.

¶ 17 Substantial, not strict, compliance is required for proper attestation, publication and acknowledgment of a will under § 55. We agree with the trial court that substantial compliance occurred. Substantial compliance is satisfied if the testator, *by words or conduct,* informs the witnesses the instrument is his will and wishes them to sign it. See *In re Hering's Estate,* 1967 OK 82, 426 P.2d 685. The contest of a will is a matter of equitable cognizance and the trial court's findings and judgment therein will not be reversed on appeal, unless clearly against the weight of the evidence. *Howard v. Smith's Estate,* 1959 OK 150, 344 P.2d 260.

1. **§ 55. Formal requisites in execution—Self-proved wills**

   Every will, other than a nuncupative will, must be in writing; and every will, other than a holographic will and a nuncupative will, must be executed and attested as follows:
   1. It must be subscribed at the end thereof by the testator himself, or some person, in his presence and by his direction, must subscribe his name thereto.
   2. The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them, to have been made by him or by his authority.
   3. The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will.
   4. There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will at the testator's request and in his presence.

We hold the trial court's order is not against the clear weight of the evidence.

¶ 18 **AFFIRMED.**

JOPLIN, P.J., and CARL B. JONES, V.C.J., concur.